No. 25,812.

THE STATE OF KANSAS, ex rel. CHARLES B. GRIFFITH, Attorney-general, *Appellee,* v. LE ROY MOWRY, County Superintendent of Public Instruction, et al., *Appellants.*

SYLLABUS BY THE COURT.

1. OFFICERS—*Arbitrary and Capricious Conduct—Validity of Acts—Relief.* Conduct of an officer which is so oppressive, arbitrary and capricious as to amount to fraud will vitiate his official acts, and courts within their equity jurisdiction have power to relieve against all injuries that would result therefrom.

2. SCHOOLS—*Arbitrary Detachment of Territory—Relief.* In an action involving the validity of the orders of a county superintendent in detaching territory from one rural high school district and attaching it to another, the proceedings considered, and *held,* the acts of the superintendent were so arbitrary, capricious and in bad faith as to be tantamount to fraud, and, under the circumstances stated in the opinion, were such that the court was warranted in restraining the unlawful acts of the superintendent without an appeal being first had to the board of county commissioners.

Appeal from Graham district court; CHARLES I. SPARKS, judge. Opinion filed July 11, 1925. Affirmed.

1. Officers, 29 Cyc. p. 1431.   2. Schools, 35 Cyc. p. 834.

*James O. McVey*, of Hill City, *Robert Stone, Geo. T. McDermott, Robert L. Webb* and *Beryl R. Johnson*, all of Topeka, for the appellants.

*Charles B. Griffith*, attorney-general, *W. L. Sayers*, of Hill City, *Charles L. Hunt, Frank C. Baldwin* and *C. J. Putt*, all of Concordia, for the appellee.

The opinion of the court was delivered by

HOPKINS, J.: The action was one involving the validity of certain orders of the county superintendent of Graham county in attempting to detach territory from one rural high-school district and attach it to another. The superintendent's orders were set aside, and the defendants appeal.

Three orders detaching territory from district No. 2 (the Bogue district) and attaching it to district No. 3 (the Hill City district) were made by the county superintendent. A fourth detachment was enjoined at the time of the filing of the action. An appeal was taken from the first order made by the county superintendent to the board of county commissioners, which sustained his action in part. No appeals were taken from the other orders.

The principal question for solution is whether the state may challenge the good faith of the county superintendent in detaching territory from a school district by an action in court without first appealing to the board of county commissioners. The state alleged, and the trial court found, that the conduct of the county superintendent, in acting upon the various petitions for detachment, was actuated by malice and that his acts were so arbitrary and capricious as to amount to bad faith.

Extensive findings of fact were made by the court, a part of which, necessary to the present discussion, follow:

"3. Bogue district was organized in April of 1920 and the Hill City district in July, 1920. The defendant Mowry was county superintendent at the time both of said districts were organized, and in writing approved the boundaries of both districts before the question of organization was submitted at special election. He was active in the organization of the Bogue district, and in fact his own recommendations as to the territory to be embraced within that district were carried out. In 1922 the real-estate valuation of the Bogue district, including all territory originally embraced within its boundaries, was $1,433,770. The valuation, of course, was the same for 1923. The total real-estate valuation for 1922 of the Hill City district, including only the territory originally embraced within its boundaries, was $2,053,490, and the same valuation obtained in 1923. By the first, second and third orders complained of, real estate of the assessed valuation of $444,145 was attempted to be taken away from the Bogue district and attached to the Hill City district. The fourth petition called for the transfer of real estate of the assessed valuation of

$17,500 from the Bogue district to the Hill City district. The above figures do not include personal-property valuations. Hill City, the county seat of Graham county, is located in the Hill City district. The territory originally in Hill City district was 160.25 square miles and in Bogue district 133 square miles. The three orders, if effective, transferred at least 63 square miles of territory from Bogue district to the Hill City district. The exact amount cannot be ascertained because of indefiniteness of the description in the third order. Originally there was in Bogue district 9.42 miles of the Union Pacific railroad, valued for taxation purposes at $26,454 per mile. In the territory attempted to be transferred by the three orders there was approximately five miles of such railroad, and in petition No. 4 two more miles were included, which, if granted, would have left but two miles of railroad in the Bogue district.

"4. In the Hill City district the tax levy in 1922 was 5½ mills and in 1923 was 6 mills, the maximum permitted by law. In the Bogue district the levy in 1922 was 2 mills and in 1923 was 3½ mills.

"5. In 1921 the Hill City district voted bonds to the amount of $135,000 to construct and equip a school building. The proceeds were all used for that purpose and a very fine building has been erected and equipped in Hill City. The Bogue district has no bonded indebtedness and for school purposes has rented and used a part of the common-school district building in Bogue, which was constructed of brick about seven years ago and which is adequate for the use of both the grade school and the rural high school. The two-mill levy in the Bogue district was sufficient to maintain its high school. Not knowing whether the orders of detachment would stand, a levy of 3½ mills was made in 1923 as a matter of precaution. None of the bonds of the Hill City district have been paid and the revenue received from the levies just referred to has proved insufficient to create any sinking or other fund for the retirement of the bonds. The expenses of maintaining the Bogue rural high-school district are $6,082.17 dollars per annum."

"15. The orders of detachments, numbers one, two and three, if permitted to stand, will reduce the area of the Bogue district nearly 50 per cent, and had petition number four been granted more than 71 square miles would have been taken out of the Bogue district, leaving approximately only 62 square miles therein, and leaving only 2 of the 7.42 miles of Union Pacific railroad property traversing the district. These orders, if permitted to stand, would practically double the rate of taxation in the Bogue district for the maintenance of its rural high school, and would leave insufficient property to properly maintain its high school, and under no circumstances could it ever, within the tax limits provided by law, raise sufficient funds to build a rural high-school building of its own.

"16. The defendant, Mowry, in calling the election to disorganize the Bogue district; in consulting with the committee in the first territory detached, and with others; in preparing the petition for the first detachment of territory; and in making the order of detachment under petition No. 1, and his similar acts and conduct with reference to petitions and orders Nos. 2, 3 and 4, did not act in good faith and take into consideration the result of his action so far as it concerned the welfare of the Bogue district, but, on the contrary, acted in

State, *ex rel.*, v. Mowry.

bad faith, arbitrarily, in an abuse of his discretion and from selfish and revengeful motives, and of [in] all of his action in attempting to disorganize said district by a special election and to thereafter accomplish the same result by disorganizing it in sections, was done by him pursuant to his plan, as stated to witnesses and previously referred to in these findings, to fight the district and break it up."

The plaintiff contends that the facts and circumstances warranted interference by the court; that the actions of the county superintendent were not in good faith, and were so oppressive, arbitrary and capricious as to amount to fraud. The defendants contend that the remedy, if any at all existed, was by appeal from the order of the county superintendent to the board of county commissioners; that the state, having failed to so appeal, had no standing in court to challenge the acts of the county superintendent. These provisions of the statute may be noted:

"The county superintendent of public instruction shall have authority to transfer territory from any rural high-school district to any adjoining rural high-school district or to any school district in which a four-year accredited high-school is maintained, and notice of any such transfer of territory shall be given as provided by law for changes in school-district boundaries, and an appeal from the action of the county superintendent to the county commissioners may be taken in the manner provided by law for an appeal in the alteration of school-district boundaries; . . ." (R. S. 72-3509.)

"It shall be the duty of the county superintendent of public instruction to divide the county into a convenient number of school districts, and to change such districts when the interests of the inhabitants thereof require it, . . ." (R. S. 72-213.)

Section 72-309 provides:

"If in the formation or alteration of or refusal to form or alter school districts, any person or persons shall feel aggrieved, such person or persons may appeal to the board of county commissioners, who shall confer with the county superintendent, and their action shall be final: *Provided,* That notice of such appeal shall be served on the county superintendent within ten days of the time of the posting of the notices of the formation or alteration of such district; such notice shall be in writing, and shall state fully the objections to the action of the county superintendent, a copy of which shall be filed with the county clerk, and also with the clerks of all districts affected by such alteration: *And provided also,* That such appeal shall be heard and decided by the majority of the board of county commissioners at their next regular meeting; and if such appeal is not sustained by them the county superintendent shall proceed to appoint the time and place for said first district meeting, which shall then proceed as by law required."

The board of county commissioners has only such authority as is conferred upon it by statute, or as may arise by necessary implica-

tion from those powers expressly granted. (*Felker v. Elk County,* 70 Kan. 96, 78 Pac. 167; 15 C. J. 457.) The power of the board of county commissioners in acting upon appeals from orders of the county superintendent is limited and restricted. It is only a reviewing body. Its function is to determine whether or not the decisions of the county superintendent shall be sustained. In *The State v. Secrest,* 60 Kan. 641, 57 Pac. 500, it was said:

"The power of the board of county commissioners to hear and determine appeals from the decision of the county superintendent as to the formation or alteration of school districts is special and limited and must be exercised strictly on the conditions under which it is given." (Syl. ¶ 1.)

The power to organize political subdivisions, including school districts, is a legislative power. The legislature in delegating this power has sometimes imposed upon the officer or body vested with that power the duty of performing other functions. This court has had occasion to consider the powers and duties of officers and bodies delegated by the legislature with power to form and create counties, townships, cities and other subdivisions of the state and sometimes to relieve against fraudulent conduct. (*The State, ex rel., v. Comm'rs of Ford County,* 12 Kan. 441; *Hutchinson v. Leimbach,* 68 Kan. 37, 74 Pac. 598; *Nash v. Glen Elder,* 74 Kan. 756, 88 Pac. 62; *Fulkerson v. Comm'rs of Harper Co.,* 31 Kan. 125, 1 Pac. 261; *The State, ex rel., v. Holcomb,* 95 Kan. 660, 149 Pac. 684; *Town of Olsburg v. Pottawatomie County,* 113 Kan. 501, 215 Pac. 451.)

Ordinarily it is the function of the legislative branch of the government to determine what is reasonable, desirable or for the best interests. On the other hand, it is a judicial function to determine whether or not certain facts establish a situation which brings the parties within the law. (*Town of Olsburg v. Pottawatomie County,* supra.) The determination of whether the interests of the inhabitants require a change of boundaries of a school district is legislative and requires the exercise of discretion by the county superintendent. The basis of his conclusion in the performance of this discretionary duty is binding upon the inhabitants of the district, providing there is no fraud and his conclusion is reached in good faith. If his actions are tainted with fraud they are open to equitable inquiry. If there is bad faith on his part his actions are reviewable by the court.

The defendants argue that there is no distinction between the administrative machinery provided by the legislature for school

matters, such as altering boundaries and the like, and the administrative remedies provided in tax matters; that in each case the legislature has lodged power in two bodies: school matters in the county superintendent, and, on appeal, in the county commissioners; tax matters in the assessor, and, on review, in the county commissioners, with a still further review by the state tax commission. Ordinarily the contention is good. Whenever a matter is properly considered by the county superintendent, an appeal lies from his decision to the board of county commissioners. Also, when a matter is properly considered by the assessor, the aggrieved party may likewise appeal. But when the county superintendent or taxing officials attempt some act beyond their power, *ultra vires,* as it were, the act may be restrained.

The case of *C. B. & Q. Rld. Co. v. Comm'rs of Atchison Co.,* 54 Kan. 781, 39 Pac. 1039, may be noted. There the state board of railroad assessors valued all railroad property in Atchison county at its true value, and the city and township assessors, by an agreement among themselves, assessed all other property at twenty-five per cent of its true value. The railroad company, without appealing to the board of equalization provided by statute, brought an injunction action to enjoin the collection of such taxes. The court held that the company was entitled to the injunction. It was contended there by the county commissioners that before the company could be permitted to go into a court of equity to enjoin the collection of illegal taxes resulting from a discrimination or overvaluation of its property, it ought to have applied to the state board of equalization for relief. The court held that the facts disclosed such a gross discrimination as could not have been adopted or applied in good faith, and hence furnished a case for equitable relief; that the board of equalization could not relieve against fraud and discrimination of the local taxing officers; and that an appeal therefor to that body was useless and should not be required. It would have availed the railroad company nothing to appeal to the board of equalization. It was not required to do a vain thing. An appeal by the plaintiff in the instant case to the board of county commissioners would have been unavailing and a vain thing. The board had no authority to investigate charges of bad faith, fraud or corruption; therefore the state would have had no adequate relief in appealing to it. On the other hand, fraud is ordinarily a basis of equitable jurisdiction.

In 16 A. & E. Enc. of L. 355, in speaking of the adequacy of legal remedy, it is said:

"It must be adequate, for if at law it falls short of what a party is entitled to, that founds a jurisdiction in equity. And it must be complete; that is, it must contain the full end and justice of the case. It must reach the whole mischief and secure the whole right of the party in a perfect manner at the present time and in future. Otherwise equity will interfere and give such relief and aid as the exigency of the particular case may require. It is not enough that there is a remedy at law. It must be as practical and efficient to the ends of justice and its prompt administration as the remedy in equity. Where equity can give relief, the complainant will not be compelled to speculate upon the chance of his obtaining relief at law."

In 16 Cyc. 36 it is said:

"The rule is uniform that where a remedy at law after statutory enlargement remains incomplete or otherwise inadequate, as where its pursuit is obstructed by such obstacles as would originally have grounded jurisdiction in equity, jurisdiction is not ousted and the court will not hesitate to exercise it."

The county superintendent was found by the trial court to have acted fraudulently. Unless his unfaithful acts may be challenged in this manner they must stand. A court of equity is the only tribunal vested with authority to inquire into the facts. It cannot be done by a reviewing board. It is suggested that, inasmuch as there was an appeal from one of the orders of the county superintendent and no bad faith or fraud is charged against the board of county commissioners, that the state is in no position to challenge the acts of the superintendent in making the order. The bad faith and fraudulent conduct of the superintendent inhered in the proceedings from the beginning. It may also be noted that the board did not follow the provisions of the statute. It neither sustained nor rejected the order of the county superintendent. It attempted to modify it. The action was without statutory sanction.

The defendants cite and rely upon *Benn v. Slaymaker,* 93 Kan. 64, 143 Pac. 503; *Reno Lodge v. Grand Lodge,* 54 Kan. 73, 82, 37 Pac. 1003; *Salthouse v. McPherson County,* 115 Kan. 668, 224 Pac. 70; *Finney County v. Bullard,* 77 Kan. 349, 94 Pac. 129; *Stone v. Fritts,* 169 Ind. 361; *Adams & Freese v. Kenoyer and Wife,* 17 N. D. 302; cases cited in L. R. A., n. s., 1916A, 972, and 16 L. R. A., n. s. 807.

They do not support the defendants' contention. For instance, in the Bullard case the court denied the relief sought because there was no imputation against the good faith of the board of county commissioners. The court said:

State, *ex rel.*, v. Mowry.

"The legislature has provided an adequate remedy at law for error and excess in valuations. Bullard availed himself of that remedy, and from the board of equalization obtained a review and revaluation of his property, which is binding upon him in the absence of special circumstances entitling him to an appeal to a court of equity. There is no imputation against the good faith of the board in making its decision." (p. 356.)

In *Symns v. Graves*, 65 Kan. 628, 70 Pac. 591, it was said:

"But fraud, corruption and conduct so oppressive, arbitrary or capricious as to amount to fraud will vitiate any official act, and courts have power to relieve against all consequential injuries." (p. 636.)

The case of *Lindley v. State Board of Administration*, 117 Kan. 558, is cited and relied on by the defendant. There the chancellor of the university was removed by the board under a statute which reads:

"The said chancellor shall hold his place at the pleasure of the board." (R. S. 76-304.)

It was said:

"The court cannot review the action of the board in removing an officer who holds during its pleasure unless upon ground of actual corruption or what would be tantamount thereto." (Syl. ¶ 3.)

The statutes under which the county superintendent was acting gave him no power to detach territory from one school district and attach it to another at his pleasure. Considering all the circumstances, we are of the opinion that the acts of the superintendent were tantamount to actual fraud. A school district's stability may not be jeopardized at the whim or caprice of a county superintendent. Other matters argued in the briefs need not be discussed.

The judgment is affirmed.

Dawson, J., not sitting.

Harvey, J. (dissenting): The question of the advisability of change of boundaries of school districts or other municipal or quasi-municipal subdivisions of the state is purely a legislative question, as distinct from a judicial one. It is vested in the legislative branch of our government, the authority of which is limited only by the constitution. When the legislature has delegated its authority to create or modify such boundaries in specific instances to county superintendents and boards of county commissioners, to be exercised in accordance with certain rules laid down by the legislature, courts may inquire into the exercise of that authority by such subordinate

6—119 Kan.

boards far enough to see if they have been or are being exercised in accordance with the legislative rules or statutes governing such matters. That is as far as the courts can inquire into it. The motives which prompt legislative action are not a proper subject of inquiry by the courts.